```
     E9H3CLAC

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                               09 CR 813 (DLC)

 5   NAHEEM CLARK,

 6                  Defendant.

 7   ------------------------------x

 8                                             New York, N.Y.
                                               September 17, 2014
 9                                             11:15 a.m.

10
     Before:
11
                       HON. DENISE COTE,
12
                                        District Judge
13

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     AMANDA KRAMER
17        Assistant United States Attorney

18   FASULO SHALLEY & DiMAGGIO
          Attorneys for Defendant
19   MARGARET SHALLEY

20   ALSO PRESENT:  U.S. Probation Officer Theresa Maisano

21

22

23

24

25
```

E9H3CLAC

1      THE DEPUTY CLERK:  United States of America v. Naheem
2 Clark.  Is the government ready to proceed?
3      MS. KRAMER:  Yes.  Good morning, your Honor.  Amanda
4 Kramer for the government.  Joining me at counsel table is
5 Theresa Maisano, a senior U.S. probation officer in this
6 district, and with the Court's permission, Samantha Oakes, an
7 intern with the United States attorney's office.
8      THE COURT:  Thank you.
9      THE DEPUTY CLERK:  For defendant Clark, are you ready
10 to proceed?
11      MS. SHALLEY:  Yes, your Honor.  Margaret Shalley for
12 Naheem Clark.  Good morning.
13      THE COURT:  Good morning.  Ms. Shalley, have you and
14 your client both read the presentence report?
15      MS. SHALLEY:  The original -- you mean the
16 specifications?
17      THE COURT:  I shouldn't say the presentence report.  I
18 should say I think the most recent one is the March 20, 2013,
19 probation department report.
20      MS. SHALLEY:  Yes.
21      THE COURT:  Thank you very much.  And I have received
22 certain submissions in connection with this sentencing
23 proceeding.  I have the defendant's memorandum of September 8
24 with a request that that be filed under seal.  And I think,
25 actually, it shouldn't be entirely.  I think there is very

1   limited reference to the defendant's cooperation.

2           MS. SHALLEY:  Judge, do you want me to file it on

3   Pacer and just take out the lines related to his --

4           THE COURT:  Yes.  You can file it in redacted form as

5   permitted by our local ECF rules.

6           MS. SHALLEY:  Okay.

7           THE COURT:  And just give Ms. Rojas the complete pages

8   for which redactions were taken, and we'll file that under

9   seal.

10          MS. SHALLEY:  Thank you.

11          THE COURT:  I have a letter from the defendant which

12  we received yesterday and docketed to give notice to the

13  parties.  And I understand from my deputy that both attorneys

14  have reviewed the defendant's letter which is dated

15  September 11, but was received by us on the 16th and docketed

16  on the 16th.  And then I have a letter from Ms. Kramer,

17  one-page letter of September 15.

18          As I remember from the time of the allocution, the

19  probation department is no longer recommending a sentence at

20  the high end of the guidelines range of 46 months, but instead

21  is recommending a sentence within the guidelines range which is

22  37 to 46 months.  Is that true, Ms. Kramer?

23          MS. KRAMER:  Yes, your Honor, that is correct.

24          THE COURT:  Is that the government's recommendation as

25  well?

1           MS. KRAMER:  Yes, your Honor.  The government notes
2  that the defendant may be sentenced up to five years under the
3  statute, and the guidelines range is 37 to 46 months.
4           In order to recommend a sentence other than a sentence
5  within the guidelines range, every AUSA would need to seek
6  approval to do that.  I did not do that in this case, and
7  intended to simply seek a sentence within the guidelines range.
8           And I have some hesitation about that after reviewing
9  the defendant's letter to the Court in which he makes a number
10 of statements that are contradicted by the evidence the
11 government would have offered at a hearing, had we had a
12 hearing, had he not entered a plea of guilty.
13          He seems in his letter to disclaim any responsibility
14 for participating in a conspiracy to distribute narcotics, and
15 indicates that he merely knew that there were drugs in the
16 home --
17          THE COURT:  I don't think he admits that.  In fact, I
18 don't see in this letter any admission that he had knowledge
19 that Mr. Cruz had drugs.
20          MS. KRAMER:  I think, your Honor, your Honor is
21 correct.  He says "I know Mr. Cruz to be a user of drugs and a
22 dealer of."  But are you're right, your Honor.  He doesn't
23 actually say he knew those specific drugs were there.  He says
24 he called Mr. Cruz and then he moved his drugs.  And he says "I
25 did not have a stake in Mr. Cruz's drugs."

1    Cruz entered a guilty plea in Tioga County on May 31,
2    2013, in which during his allocution, he said "Me, Naheem, and
3    Norma Jamie, we all was aware we had the drugs.
4    "The Court:  Were you in a friend's house?
5    "The Defendant:  We was in a friend's house.
6    "The Court:  You were at a friend's house and what happened?
7    "Cruz:  We were basically staying there partying where I was
8    using some drugs, and at the same time we were also selling
9    some.  We was also selling some of what I was using."
10       So, notwithstanding all of the statements in the
11   letter, I mean, there is plenty more.  I represented to the
12   Court what the evidence would be at the hearing when we were
13   ready to proceed to a hearing, and the defendant entered a plea
14   of guilty to possession with intent to distribute.
15       THE COURT:  Hold on one second.  I don't remember your
16   description of what the evidence would have shown.
17       MS. KRAMER:  I think, your Honor, it was not at the
18   plea proceeding.  It was at the prior conference in the context
19   of discussing to what extent the government would be offering
20   direct proof and to what extent it would be offering some proof
21   in the form of hearsay.  But, I can summarize, your Honor.
22       THE COURT:  Well, I will want that on the record.  I
23   will want that on the record today again.
24       But, let me just as a procedural matter find out if
25   the defendant wishes to withdraw his admission of a violation

1   as charged in Specification One.
2               (Defendant conferring with his attorney)
3               MS. SHALLEY:  No, your Honor.  He does not.
4               THE COURT:  Have you had enough time talk to with your
5   client about that decision to feel comfortable, Ms. Shalley, or
6   do you need more time?
7               MS. SHALLEY:  I actually only was aware of the letter
8   this morning.
9               THE COURT:  I think we had a break of about 20
10  minutes, and I'm happy to give you more time.
11              (Defendant conferring with his attorney)
12              THE COURT:  Ms. Shalley, we're going to take a break.
13              MS. SHALLEY:  Thank you.
14              THE COURT:  Please, take as much time as you need.
15  This is important to the defendant to decide, and of course to
16  you as his counsel.  Just let Ms. Rojas know when you'd like to
17  resume.
18              MS. SHALLEY:  Thank you so much.
19              (Recess)
20              THE COURT:  Ms. Shalley, on reflection, I'm wondering
21  if I shouldn't put this sentence over for a day or two to give
22  you and your client an opportunity to carefully think about
23  these issues.
24              THE DEFENDANT:  Can I speak by any chance?
25              THE COURT:  Consult with Ms. Shalley first.

1           I'm just going to put this over.

2           MS. SHALLEY:  I understand.

3           THE COURT:  I don't want there to be any concern on
4    the defendant's part, ever, not today, not in the future, that
5    there was a need to rush for him to make a decision about these
6    issues.  This is important to him.  I'm going to sentence him
7    at some point here.  I mean, theoretically if he did decide to
8    make a motion to withdraw, we'd play that out and I would
9    decide whether or not to give him that opportunity.  And
10   theoretically there might end up being a hearing, and the
11   government would be put to its proof and it would or wouldn't
12   carry that burden.  I just want to make sure that we're all
13   being careful here.

14          MS. SHALLEY:  I understand.

15          MS. KRAMER:  Your Honor, if I may say something for
16   the record.  In the weeks leading up to the scheduled hearing
17   and ultimately the defendant's guilty plea, I believe
18   approximately one week before the hearing was to take place, I
19   engaged in numerous conversations with Ms. Shalley during which
20   she vigorously advocated for her client.  I produced to her all
21   of the evidence that I intended to offer and gave her updates
22   as we got closer, including the 3500 material for all the
23   witnesses that I intended to call.  And I understand from my
24   conversations with her that she went over all of that with the
25   defendant prior to his guilty plea.  And she's continued to

1    advocate vigorously for him leading up to the sentencing.

2    So, I agree completely with the Court's decision to
3    put this over so they have additional time to consult and so
4    that the defendant doesn't ever have any doubt about the
5    vigorous and dedicated representation that Ms. Shalley has
6    given to this case.

7    THE COURT:  I think I'm going to ask the government to
8    put on the record a description, it doesn't have to be a
9    complete description, but a substantial description of the
10   evidence that it intended to offer at the hearing.

11   MS. KRAMER:  Certainly, your Honor.  First, the
12   government intended to call two law enforcement witnesses,
13   detectives from a narcotics task force in upstate New York who
14   were working on the investigation that ultimately led to this
15   defendant's arrest.  One of those detectives engaged in
16   surveillance of the defendant the day of his arrest and had
17   previously conducted surveillance, seeing the defendant drive
18   the car that he was arrested driving.  And in fact, only saw
19   the defendant driving that car until the day of his arrest when
20   it appeared that the defendant had noticed that he was being
21   followed by law enforcement, at which point he had the
22   passenger in the car pull over.  The defendant had the
23   passenger in the car get in the driver's seat, and the
24   defendant got into the back seat and crouched down and hid
25   until the car ultimately went back to the house, apparently

1     against the defendant's wishes, according to the testimony of

2     the driver of that car in the grand jury in Tioga County.

3            But the surveilling agent would testify that the car

4     pulled back in front of the house.  The woman who was driving

5     got out, and police officers encountered the defendant hiding

6     in the back seat on the floor of the car.

7            That same detective would testify as to some of the

8     physical evidence that was found in that car.  There was a

9     wallet containing fraudulent identification with the

10    defendant's photograph but another person's contact

11    information, which was a real identification document obtained

12    from South Carolina.  That car also contained black rubber

13    bands in the glove compartment that were the same type of

14    rubber bands that were used to make the heroin bundles that

15    were recovered by a different detective from behind the house

16    where Clark's co-conspirator, Manuel Cruz, tried to hide the

17    drugs.

18           Another detective who did the search of the house and

19    actually found the heroin would testify that she was conducting

20    surveillance on the house, and received a call from the

21    detective who was doing surveillance of Clark's car.  And she

22    received a call saying, basically, I think Clark has made us,

23    he's seen the surveillance.  And very shortly thereafter,

24    Manuel Cruz jumped out of the window of the house, and tried to

25    hide a bag behind the house, and that bag was determined to

E9H3CLAC

1    contain bundles of heroin.  Cruz was arrested and the house was
2    searched.
3              The same detective who did the search would testify
4    there was a bedroom that appeared to be occupied by Clark.  The
5    clothes were Clark's size.  They would not have fit anyone else
6    in the house.  Manuel Cruz was not the same size as Clark.  And
7    in that bedroom, there was a digital scale, of the type
8    commonly used by drug dealers to weigh drugs and packaging.
9    And also that is the bedroom that another witness testified in
10   the state grand jury was being occupied by Clark.
11             The government would also call one or both of the lay
12   witnesses who testified in the grand jury in the state.  One of
13   them testified that she had been basically selling drugs and
14   staying at that house with Manuel Cruz and with Naheem Clark
15   for approximately one month prior to the date of the arrest.
16   And that they were all in it together selling heroin and crack
17   cocaine.
18             And the other witness was the driver of the car who
19   testified in the grand jury about the way things happened that
20   day, that they were selling drugs in her house, and she knew
21   about it, and would describe Clark basically telling her to
22   drive and to pull over that day because the police were
23   following them.
24             If the government couldn't call those witnesses
25   directly, the government would attempt to offer their testimony

1    in the state grand jury, which was sworn testimony, through
2    another witness.
3              The government would also introduce physical evidence,
4    as we've already described, the digital scale, rubber bands,
5    and text messages that were taken from the phones that were
6    seized from Cruz and Clark the day of the arrest.  Text
7    messages between the two of them evince a drug distribution
8    conspiracy.  There is slang used, and the detective from Tioga
9    County could testify about the meaning of that slang.  It is
10   fairly plain that it was discussion between two drug dealers
11   about their sale of drugs.
12             I think that's a fairly complete testimony, although I
13   may be leaving some things out.  Oh, and as I said earlier,
14   your Honor, Manuel Cruz gave that allocution during his plea in
15   the state, and the government would attempt to offer that as
16   well.
17             THE COURT:  Ms. Rojas, please give us an adjourn date
18   here.
19             THE DEPUTY CLERK:  Counsel, the Court is available
20   Friday, September 19, at 3:30.
21             MS. KRAMER:  Thank you very much.  That works for the
22   government, your Honor.
23             MS. SHALLEY:  Thank you.
24             THE COURT:  The record should reflect that Ms. Rojas
25   consulted with counsel before making that announcement to get

E9H3CLAC

1    their availability.  Thank you all.
2                                    o0o
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25